IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KEVIN CLARK,

    Petitioner,                              No. CIV S-05-2606 MCE GGH P

   vs.

DAVID RUNNEL, et al.,               <u>ORDER AND</u>

    Respondents.                    <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2002 conviction for first degree murder on the following ground: the trial court violated his constitutional right to present a defense by denying his motion for a new trial. Petitioner also seeks an evidentiary hearing as to this claim.

        Petitioner contends that the victim, Kristy Green, who was found to have been murdered at or about March 2000, was alive and well when "her" welfare check was cashed in early November of 2001. A comparison of the November 2001 check provided made out to Krist*ie* Green in the amount of $647.00: with the undisputed evidence that the victim spelled her name Krist*y* Green (as that spelling occurs throughout the victim's welfare records) – with the

1

undisputed evidence that the last welfare check issued to "Kristy" occurred in December of *1999* in the amount of *$481,* – with the "Kristie" signature on the 2001 check entirely dissimilar to the "Kristy" signature that appears throughout her welfare records – makes petitioner's claim herein entirely unwarranted, and the purported corroborating evidence submitted at the time of petitioner's new trial motion in state court, disingenuous or irrelevant.

After carefully considering the record, the court finds that an evidentiary hearing is not warranted and recommends that the petition be denied.[1]

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a

---

[1] This court addressed a habeas corpus petition filed by petitioner's co-defendant, Helen Tibon, raising the same claims as petitioner now raises, however, no new evidence was submitted in that case. Petitioner chose to rely solely on the state court new trial record. <u>See</u> CIV S-05-2449 GEB GGH P. On March 3, 2008, the district court adopted this court's December 11, 2007, findings and recommendations recommending that the petition be denied. That case is now on appeal.

Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III. Factual Background

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

People's Evidence

In December 1999, Kristy Green and her three-year-old daughter were living with Kevin and Helen, who were siblings, in their home on Lock Avenue in Sacramento. Kevin and Helen, along with relatives and friends, including Green, made their living using credit cards, checks, and other financial information they found in mail they stole. Green was arrested in the mail-fraud scheme and spent about two months in jail before Kevin bailed her out.

LaTanya Young, a very good friend of Helen's, testified that in early March 2000, Helen telephoned her, saying that she and Kevin had killed Green. FN3 Young went to Kevin's residence where she found Green nude in a bathtub with ants crawling on her. Green had bruises and burns on her cheek and neck and had trouble breathing, but she was still alive.

[FN3. Young had entered a plea where, in exchange for testifying truthfully at trial, she would plead guilty to being an accessory to Green's murder.]

The following day, Young again went to Kevin's residence. There she was shown Green's body encased in dark bubble wrap in the trunk of a car in the garage. Frightened that Helen might harm her, Young eventually assisted Kevin and Helen in burning Green's clothing in Kevin's fireplace. Green's body was first taken to Young's home and then to Young's mother's home where Kevin commenced dismembering it with a saw in the bathroom. At one point, Kevin emerged from the bathroom holding Green's severed head, stating, "Fatality," a term from the computer game Mortal Combat. Green's dismembered body was placed in large paint buckets and taken away by Kevin and Helen.

Louie Arellano, Kevin and Helen's cousin, lived in a home that belonged to Kevin and Helen's mother. Arellano testified that he came home after work in March 2000, and found Kevin and Helen burning items in his wood burning stove. FN4 They told Arellano that they were burning credit cards and mail. The following morning, Arellano looked in the stove and saw half of a jawbone and teeth. He threw them away. When Arellano returned from work, the stove had been cleaned.

[FN4. Arellano had previously pled guilty to being an accessory to Green's murder.]

Following a conversation with Helen, Arellano went to his garage where he found five paint buckets which contained the chopped up body parts of an African-American. Arellano asked Kevin and Helen what had happened. They told him that they had made Green lie on a tarp by shooting her in the foot and then rolled up the tarp, causing her to suffocate. They admitted taking Green's body to Young's mother's home where they chopped it up and put the parts into the buckets which were now in Arellano's garage. Frightened that he would be charged with Green's murder, Arellano told Helen he wanted her to get the body parts out of his garage; however, the body parts remained there for several weeks.

Arellano accompanied Kevin to Home Depot where Kevin purchased a garbage can, duct tape, caulking material, and plastic bags. Kevin put the garbage can and materials in Arellano's garage. Arellano returned home one day and found a U-Haul truck in his driveway with the garbage can in it. Arellano drove the U-Haul truck to a secluded location on the Sacramento River where the garbage can was kicked down an embankment and into the river. Also present and assisting were Helen's husband, Michael Shares, and friends David Nicol and Wendell Wilson. Later, Arellano, Kevin, and Wilson each separately led the police to the same area of the Sacramento River where the garbage can was dumped.

Charity Cisco testified Kevin told her that he and Helen had killed Green, wrapped her body in plastic and placed it in "the trunk." Lamont Barron, Amanda McGriff, and David Nicol each testified that Kevin told them he had killed Green, chopped up her body, and burned parts of it in a fireplace.

II

Defense Evidence

Kevin testified, denying that he or anyone had killed Green. Instead, the purported killing of Green was staged to make Young, Arellano, Shares, and Wilson believe they were accessories to a murder, which would keep them in line so they would not tell about the mail-fraud scheme. Kevin claimed the paint cans were filled with dog feces, not Green's body.

Kevin was impeached by three interviews he had with the police. Kevin initially denied knowing that Green was dead. In the second interview, Kevin said that Helen had killed Green and dismembered her body, but he was not present. In the third interview, Kevin admitted he was present when Helen killed Green and that he had assisted in cutting up her body.

Kevin testified his stories to the police changed because the police threatened him and told him to give a statement consistent with those given by other witnesses.

In an effort to show that Green was still alive after her alleged death, Helen called Shane Allen as a witness. On direct examination, Allen testified that on May 1, 2002, he and his girlfriend, Jessica Lovins, encountered a female "acquaintance"

> with whom they "had had problems with awhile back where [they] were living." While in a parking lot, the female made threatening remarks to Allen while holding a club normally used for locking a steering wheel. Allen and Lovins left and Allen reported the incident to the police. About a month later, Allen was shown two "really bad quality" black and white photos and selected a person whom he thought was the person who assaulted him, which was a photo of Kristy Green.FN5
>
> > [FN5. During Kevin's testimony, he admitted knowing that Green had some checks with the name Latisha Baptiste on them.]
>
> On cross-examination, Allen testified to considerably more detail than he had on direct. Allen said that the name of the person whom he encountered was "Latisha," who lived in the same apartment complex as he and Lovins. Allen was later shown five color photos and immediately selected Baptiste as the assailant. Allen then identified Latisha Baptiste, who had been brought into court by the prosecutor, as the person with whom he had the encounter. Allen affirmed that there was no question in his mind that Baptiste was the person who held the club in the parking lot. The prosecutor then called Lovins who likewise made an in-court identification of Latisha Baptiste as the person with whom she and Allen had the encounter.

Respondent's Lodged Document no. 4, Opinion of California Court of Appeal, pp. 1-3.

IV.  <u>Analysis</u>

Petitioner initially argued that the trial court's denial of his motion for a new trial violated his right to present a defense.  He later changed that theory to one of "actual innocence" in his traverse.

Initially relying primarily on <u>Chambers v. Mississippi</u>, 410 U.S. 284, 93 S.Ct. 1038 (1973), and <u>Rock v. Arkansas</u>, 483 U.S. 44, 107 S.Ct. 2704 (1987), petitioner argued that the trial court's denial of the new trial motion based on newly discovered evidence violated his right to present a defense.  While criminal defendants have a constitutional right to present a defense, see <u>Greene v. Lambert</u>, 288 F.3d 1081, 1090 (9th Cir. 2002), neither <u>Chambers v. Mississippi</u> nor <u>Rock v. Arkansas</u> stand for the proposition that the denial of a motion for a new trial based on newly discovered evidence may violate this right.  Rather, these cases involve events occurring during criminal trials.  This court is aware of no clearly established Supreme Court authority standing for the proposition argued by petitioner.

6

Petitioner has not identified any more specific constitutional provisions violated by the denial of his new trial motion in his petition. Petitioner does not contend that the newly discovered evidence was suppressed by the prosecution. Petitioner does not contend that there was insufficient evidence to support his conviction. Petitioner also does not allege that he received ineffective assistance of counsel at his new trial motion. Petitioner does not *initially* raise an actual innocence claim. Petitioner's only claim is that the trial court reached the wrong conclusion on the new trial motion.

Thus, no federal claim cognizable after the AEDPA exists for this petition for habeas corpus as initially set forth by petitioner. Construing the petition broadly by incorporating the traverse, petitioner, in essence, attempts to present a claim of actual innocence in his traverse. Obviously, if the evidence presented at the motion for new trial were true, petitioner would be actually innocent of killing the victim because the victim would still be alive, or at least alive after the time petitioner could have had anything to do with the murder. However, the standard for such a claim is exceedingly high.

> We conclude that the Herrera majority's statement that the threshold for a freestanding claim of innocence would have to be "extraordinarily high," id. at 417, 113 S.Ct. at 869; accord id. at 426, 113 S.Ct. at 874 (O'Connor, J., concurring), contemplates a stronger showing than insufficiency of the evidence to convict. We therefore decline to adopt the modified Jackson standard. We believe that the required showing would have to be at least as high as the more demanding standard articulated by Justice Blackmun in his Herrera dissent. Justice Blackmun stated that to be entitled to relief, a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent. See Herrera, 506 U.S. at 442-44, 113 S.Ct. at 882-83 (Blackmun, J., dissenting).

Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).

The undersigned first starts with the analysis after evidentiary hearing on motion for new trial given by the state court as characterized by the California Court of Appeal. However, the state court was focused on the credibility of the new witnesses, as the welfare

records which dispositively show the difference in the two "Kristy/Kristie" Greens, were not available to that court.  Nevertheless, the other reasoning of the appellate court is germane to the issue of actual innocence herein.

> Following their convictions for first degree murder, Kevin and Helen unsuccessfully moved for a new trial based upon purported new evidence that would show that Kristy Green was alive after her alleged murder in March 2000. Kevin contends the court's denial of the motion was an abuse of discretion. We disagree.
>
> To be entitled to a new trial on the ground of newly discovered evidence, the defendant must show that, inter alia, it is probable that had the evidence been presented to the jury, a different result would have occurred. (Pen.Code, § 1181, subd. 8; People v. Martinez (1984) 36 Cal.3d 816, 821.) " ' "The determination of a motion for a new trial rests so completely within the [trial] court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (People v. Delgado (1993) 5 Cal.4th 312, 328.) Additionally, " '[T]he trial court may consider the credibility as well as [the] materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' " ( Id. at p. 329.)
>
> At the hearing on the new trial motion, Christopher Rowe, who was then serving time in prison for possession of cocaine for sale, testified that he had grown up with Kevin and Helen and had met Kristy Green in 1995 at Kevin's home. Rowe, who had "jumped bail" and failed to show for sentencing in January 2002, saw and spoke with Kristy Green at Ray's Taco Rico around March 6, 2002. Later that day, he and Green went to Rowe's sister's house where they smoked marijuana and had sex. While Rowe was in the prison yard, he learned of Kevin's conviction for Green's murder from a man named "Boss" who showed him a newspaper clipping. However, while Rowe had grown up with "Boss" and had known him 12 years, Rowe did not know Boss's real name.
>
> Tandra Davis testified that she worked for Money Mart from January 2001 to November 2002. Money Mart business records showed that Davis cashed a welfare check on November 3, 2001, for a customer identifying herself as Kristy Green. Although Davis serviced 50 to 60 customers a day, she claimed that she remembered the transaction with Green because Green had been "antsy" and three weeks later Davis was questioned by an investigator about Green's having cashed a fraudulent check. Davis was unable to remember what Green was wearing, what form of identification she presented, or whether anyone was with Green.
>
> On January 6, 2003, Davis was shown two photographs of Kristy Green by a defense investigator. Davis identified Green as the person who cashed the check on November 3, 2001.
>
> Brenda Zeno, Tandra Davis's mother, testified that when the defense investigator was showing the photos of Kristy Green to her daughter, Zeno also looked at them. Zeno thought that in November 2002 she had seen Green at Cosumnes

River College and at the WIC office (a women's nutritional program) and had spoken with her. Zeno was not wearing her "reading glasses" when she viewed the photos. Zeno told the investigator that she was "almost completely positive" that the person in the photo was the same person she was speaking about.

Kevin and Helen also presented letters supposedly written by Green after the date of her murder. However, the handwriting could not be verified as that of Green.

The court denied the motion, finding that even if the new evidence been presented, the jury would not have returned a different verdict.

Kevin argues the court's ruling was error because the new evidence, if believed, would have compelled the jury to acquit him. The evidence was likely to have been believed, Kevin continues, because neither Davis nor Zeno had any connection with either Kevin or Helen, and Davis's testimony was backed up by business records showing that the November 3, 2001 transaction with Green occurred after Green's purported death. FN6 The argument is not persuasive.

> FN6. Understandably, Kevin does not rely on the testimony of Rowe nor the letters purportedly written by Green after the charged date of her death.

The Money Mart records showed only that Davis had cashed a check on November 3, 2001, for someone identifying herself as Kristy Green. However, the weight to be accorded to these records was essentially nullified because, in the words of the trial court, Kevin and Helen were "immersed in the commission of the use of disguise, deceit and fraud." Thus, it would not have been difficult for Kevin and Helen to find a suitable substitute for Green in order to cash a check.

Nor were Davis's and Zeno's photographic identifications of Green particularly reliable. Davis and Zeno were shown only photographs of Green, which they viewed at the same time. Davis's photo identification of Green occurred on January 6, 2003, which was well over a year after the check cashing transaction. Davis did not leave her employment at Money Mart until November 2002, during which time she serviced 50 to 60 customers a day during the week. Notwithstanding the number of people Davis serviced since the November 3, 2001 transaction, she claimed to have remembered Green partly because "it was a busy day" and Green "wasn't in the mood for waiting." However, when it was pointed out to Davis that November 3, 2001, was a Saturday, Davis admitted that Saturdays were "light day[s]." Additionally, Davis was unable to remember what type of identification Green presented, what Green was wearing, or if Green was with anyone. Finally, Kristy Green's name was on the bottom of the photographs shown to her by the investigator, which was a highly suggestive circumstance.

Zeno's identification was likewise unreliable. Zeno was present when the defense investigator was showing Green's photographs to Davis, and Zeno overheard their conversation, which included Davis's identification of Green. Although Zeno testified at various times that she was positive of her identification of Green as the person whom she had seen and spoken with at school and at the WIC office, Zeno initially described her identification of Green as follows: The investigator was showing the photographs to Davis when "I came outside. And I just looked at 'em and I wasn't-I didn't even have, like, my reading glasses on. So I couldn't read it,

> so I said, oh, she looks familiar. That looks, you know-and that was that."
>
> In contrast to the evidence offered in support of the motion for a new trial, the evidence at trial showed that Kevin and Helen, along with Kristy Green and others, were involved in a mail-fraud scheme using fake identities. Kevin and Helen were concerned that Green, who had been arrested, was going to inform on them, so they bailed her out with the intent of killing her. Young testified that Kevin and Helen told her they had killed Green, she saw a body that Kevin and Helen said was that of Green, and Young saw Green's severed head when Kevin held it up, saying "Fatality."
>
> Arellano, who knew of Kevin's and Helen's threat to kill Green, found teeth and a jawbone in his stove. He confronted Helen and she told him the body was in his backyard. He checked and found five paint buckets, one of which was partially open and contained body parts of an African-American. Kevin and Helen admitted to Arellano that they had killed and dismembered Green's body.
>
> David Nicol testified that Kevin showed him the buckets in Arellano's garage. Nicol touched a torso, which was of an African-American. Additionally, Charity Cisco, Lamont Barron, and Amanda McGriff, none of whom were involved in the mail-fraud scheme, each testified that Kevin admitted to them that he killed Green and chopped up her body.
>
> Comparing the evidence at trial with that offered at the new trial motion, the trial court could reasonably conclude that for the jury to have come to a different result than it did, the jury would have to reject the trial testimony, which bordered on overwhelmingly showing that Kevin and Helen killed Green, in favor of the weak evidence relating to the identifications made by Davis and Zeno. Given the unlikelihood of such a scenario, the trial court did not abuse its discretion in denying the new trial motion.

Respondent's Lodged Document No. 4, Opinion of California Court of Appeal, pp. 4-5.

As observed previously, the Court of Appeal, and the trial court, had labored under the mis-impression that the check at issue was written to the "Kristy Green" germane to this case. However, the welfare records examined by petitioner, and filed with this court, completely eradicate that mis-impression, and make an insufficient actual innocence theory as presented to the state courts more akin to an actual hoax:

1. The welfare check was written to a "Kristie" Green and not "Kristy" Green; (Petitioner Exhibit 4 (Union Bank), Docket # 47) (copy of the check attached to these Findings and Recommendations);

\\\\\

2. The victim in this case, as is easily gleaned from the welfare records, never used the first name "Kristie" with welfare authorities; the authorities did not keep her records in the name of "Kristie," and a welfare check to "Kristy" would not have been issued in the name of "Kristie." (An exemplar welfare record is attached to these Findings and Recommendations);[2]

3. The last welfare check issued to "Kristy" Green was issued in December 1999; (Welfare Records; see also Petitioner's Opposition to Request for Limited Evidentiary Hearing at 3[3];

4. The welfare check issued to "Kristie" Green was issued November 1, 2001, long after "Kristy" Green was issued her last welfare check;( see check attached);

5. Even if the undisputed records showing that welfare eligibility for "Kristy" Green terminated after December 1999 were somehow in error, "Kristy" Green was only eligible for $484 in December of 1999; it is highly doubtful that her eligibility amount would have increased to $647 in 2001, the amount issued to "Kristie" Green–;

6. The signatures of "Kristie" Green and "Kristy" Green (the victim) are entirely dissimilar; (compare the signature on the endorsed check with the welfare record exemplar – both attached to this Findings and Recommendations).

As set forth by the Court of Appeal, the adverse credibility findings for the "check cashing" witnesses, who claimed long after the fact that they "saw" "Kristy" Green cashing the November 2001 check, are only enhanced when one understands that a completely different "Kristie" Green was involved with the November 2001 check. Petitioner's attempt to criticize those findings on account of petitioner's being in jail with his confederate (Tibon) and being

---

[2] Petitioner's counsel herein petitioned the court to investigate the welfare records of Kristy Green, the victim. The court had counsel file the records under seal. The undersigned now orders the record expanded, Rules for § 2254 cases, Rule 7, to include the welfare records.

[3] "[W]hen this federal habeas counsel [petitioner's counsel] inspected Kristy Green's subpenaed (sic) County Welfare records for three hours on July 27, 2007, he found no evidence of welfare payments to Kristy Green since December, 1999, and no record of her being on welfare thereafter."

11

unable to participate in a deception themselves to cash the checks, is a meritless criticism when one understands that there could have been no deception or involvement on the part of any one involved in "Kristy" Green's death vis-a-vis cashing a check – it was an entirely different "Kristie" Green involved with the check who had no involvement in the facts of this case. Petitioner's implicit argument that "Kristy" Green held onto a welfare check for years after its last issuance in 1988, and then cashed it in November 2001, is belied by the issuance date on the check – an issuance date that even petitioner's counsel concedes was long past any welfare payment issued to "Kristy" Green.[4]

In addition, the undersigned has reviewed the record, and agrees that the evidence against petitioner at trial bordered on overwhelming. The undersigned further notes that while involved defendants testifying after plea bargain might generally have some credibility issues, such is not the case here. The accessories-after-the-fact to this murder would have no incentive whatsoever to confess to being accessories to a crime that they knew was never committed. Why would they accept jail sentence if they had no information that Green had indeed met her demise and aftermath in the horrible fashion portrayed? No evidence was presented at all that these persons had such a "beef" with petitioner that they would set up this murder, i.e., make up the gruesome testimony in order to put petitioner away for life and would willingly pay the price of some years in prison for this psychic pleasure.

Finally, petitioner offers the 2006 declaration of fellow prison inmate and long-time associate of petitioner, Christopher Rowe in which Rowe maintains that he dated the deceased victim in 2001 and 2002. He also testified somewhat similarly in the state court motion for new trial. The Court of Appeal observed: "Understandably, Kevin [petitioner herein] does

---

[4] All of petitioner's evidence regarding the inability of the County to declare the "Kristie" Green check a fraudulent activity is totally irrelevant in that petitioner gives no reason why the check cashing of a person uninvolved with this case might give rise to a notion of fraud, or a fraud involved with this case. Likewise irrelevant is the evidence concerning the various banks' handling of the November 2001 "Krisite" Green check.

12

not rely on the testimony of Rowe nor the letters purportedly written by Green after the charged date of her death." (Footnote 6). Petitioner does not advance any reason why he has now had a change of heart regarding the credibility of Rowe's testimony, and now relies on this testimony given the state court's obvious rejection of this testimony as biased and fantastic. The undersigned gives no credence at all to petitioner's off again, on again acceptance of these "facts."[5]

A federal court does not have to hold an evidentiary hearing when the record refutes petitioner's factual allegations in the federal petition. In <u>Schriro v. Landrigan</u>, ___ U.S. ___, 127 S. Ct. 1933, 1940 (2007), the Supreme Court recently added another consideration in granting evidentiary hearings. The Supreme Court held that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." 127 S. Ct. at 1940. Accordingly, "[i]t follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> With the expansion of the record to include the "Kristy" welfare records, the record clearly refutes the allegations.

After independently reviewing the record, the court finds that the denial of petitioner's claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.

\\\\\

\\\\\

---

[5] If a petitioner "failed to develop the factual basis for a claim" in state court, the federal court "shall not hold an evidentiary hearing on the claim" unless the petitioner can show that one of two narrow exceptions is applicable. 28 U.S.C. § 2254(e)(2). One cannot tell the state courts not to rely on certain evidence, and then come to federal court demanding an evidentiary hearing on it, and be found to have "developed" the claim in state court. Aside from having to show why he changed his mind about this testimony, petitioner must show that the factual finding of the state courts were "clearly and convincingly" in error. §2254(e)(1). He cannot simply regurgitate the once rejected testimony and demand an evidentiary hearing.

1        Accordingly, IT IS HEREBY ORDERED that petitioner's November 19, 2007,
2   motion for an evidentiary hearing (Docket # 47) is denied; and this Order/Findings and
3   Recommendations shall be served upon counsel in the Tibon case, CIV-S-05-2449.
4        IT IS HEREBY RECOMMENDED that petitioner's application for a writ of
5   habeas corpus be denied.  It is further recommended that this Findings and Recommendations,
6   with its analysis of the evidence presented herein regarding the November 2001 welfare check,
7   be filed in the appellate case of petitioner's co-defendant, Helen Tibon, Appeal No. 08-16529, in
8   order to prevent a miscarriage of justice. shall be served upon counsel in the Tibon case, CIV-S-
9   05-2449.
10       These findings and recommendations are submitted to the United States District
11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
12  days after being served with these findings and recommendations, any party may file written
13  objections with the court and serve a copy on all parties.  Such a document should be captioned
14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
15  shall be served and filed within ten days after service of the objections.  The parties are advised
16  that failure to file objections within the specified time may waive the right to appeal the District
17  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
18  DATED: 10/08/08

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

22  clark.157